## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DOMINIQUE K. WILKERSON**                                      **CIVIL ACTION**

**VERSUS**                                                                          **No. 20-3031**

**PARISH OF JEFFERSON, ET AL.**                            **SECTION I**

## <u>ORDER & REASONS</u>

Defendant, Parish of Jefferson ("Jefferson Parish"), has filed a motion[1] for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff, Dominique K. Wilkerson ("Wilkerson"), opposes the motion,[2] and Jefferson Parish replied.[3] Jefferson Parish has also filed a motion[4] *in limine* to exclude or limit certain testimony and exhibits at trial. For the following reasons, the Court grants summary judgment in favor of Jefferson Parish on all of Wilkerson's remaining claims, *i.e.* her Title VII discrimination and retaliation claims, her parallel Louisiana state law claims, and her race discrimination claim brought pursuant to 28 U.S.C. § 1981. The Court dismisses Jefferson Parish's motion *in limine* as moot.

## I.      BACKGROUND

Wilkerson worked for the Jefferson Parish Department of Juvenile Services ("DJS") from August 31, 2019 through February 19, 2020 as a supervisor at the

---

[1] R. Doc. No. 60.
[2] R. Doc. No. 62.
[3] R. Doc. No. 68.
[4] R. Doc. No. 69.

Rivarde Juvenile Detention Center ("Rivarde").[5]   Wilkerson was classified as a probationary employee throughout her time working at DJS.[6]

When Wilkerson applied to work at DJS, Assistant Director Christopher Trosclair ("Trosclair") conducted her first interview.[7]   Trosclair recommended Wilkerson to Director Roy Juncker ("Juncker"), the appointing authority who was ultimately responsible for making employment decisions.[8]   Juncker interviewed Wilkerson and selected her for the position.[9]

Wilkerson received supervisor training with DJS, which included shadowing other supervisors and senior staff members.[10]   Wilkerson was eventually assigned to work the night shift from midnight to 8:00 A.M.[11]   On January 11, 2020, Wilkerson

---

[5] R. Doc. No. 60-2, at 1 ¶ 1.  The Court confines its analysis to the facts presented by the parties in the summary judgment statement of material facts, *see* R. Doc. No. 60-2, Wilkerson's objections thereto, *see* R. Doc. No. 62-23, and the briefing, *see* R. Doc. Nos. 60-1, 62, & 64-2.  *See* Local Rule 56.2; *see also Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004) (explaining that parties should include specific citations to summary judgment evidence); *United States v. Del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) ("Judges are not like pigs, hunting for truffles buried in the record.") (quotation marks and citation omitted).  Throughout this order, the citations to the summary judgment record reference the page numbers assigned by the Court's CM/ECF filing system, not the underlying page numbers of the deposition or exhibit documents.

[6] *Id.* at ¶ 2.

[7] *Id.* at 2 ¶ 4.

[8] *Id.*

[9] *Id.*  In addition to being Assistant Director, Trosclair was also acting as a manager at the Rivarde facility when Wilkerson began her employment.  *Id.* ¶ 5.

[10] *Id.* at 3 ¶ 9.  However, Wilkerson did not receive the full amount of her training, and her opportunities to shadow other supervisors on the day shift were limited.  R. Doc. No. 62-23, at 2.

[11] R. Doc. No. 60-4, at 108.  Wilkerson alleges several other proposed facts in the background section of her opposition memorandum.  *See* R. Doc. No. 62, at 1–2.  However, these proposed facts cite exclusively to her complaint.  *Id.* (citing R. Doc. No. 1).  This approach is insufficient to oppose a motion for summary judgment.

emailed Trosclair that she had given Detention Officer Daniell Bailey ("Bailey") two verbal warnings for sleeping on the job.[12] Trosclair responded that "sleeping on the job will not be tolerated on any level," and he requested that Wilkerson detail "the times and dates" of each instance that Wilkerson caught Bailey sleeping.[13] In subsequent emails, Wilkerson conceded that she did not know "the exact days" that she reprimanded Bailey, and Trosclair reminded Wilkerson of her duty to document verbal warnings, "especially for something so serious [as sleeping]."[14]

On January 13, 2020, Trosclair made a surprise visit to Rivarde at 3:00 A.M., at which time Wilkerson and Brishawna Silby ("Silby"), were both on duty as supervisors.[15] Trosclair stated that during this surprise visit, he observed Silby sleeping in the supervisor's office where Wilkerson was also working.[16] In a written statement, Silby claimed that she "may have dozed off while reading something at my desk but [she] did not fall asleep."[17]

---

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that the party responding to a motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue). The parties do not dispute that Wilkerson was assigned to work the night shift.

[12] R. Doc. No. 60-2, at 3 ¶ 10. *See also* R. Doc. No. 62-17, at 8. The deposition testimony usually refers to Bailey by her last name only. The hand-written statement that she provided is difficult to read, but it appears that her first name is spelled "Daniell." *See* R. Doc. No. 60-5, at 177. The typed transcript also spells her first name as "Daniell." *Id*. at 146.

[13] R. Doc. No. 62-17, at 8.

[14] *Id*. at 6–7.

[15] R. Doc. No. 60-2, at 3 ¶ 10.

[16] R. Doc. No. 60-2, at 3 ¶ 11.

[17] *Id*.

3

That same evening, when Wilkerson and Silby were on duty as supervisors, Trosclair also caught two detention officers sleeping: Bailey and Jacqueline Taylor ("Taylor").[18]  Bailey admitted to sleeping in a written statement, stating that she appeared "to have fallen asleep."[19]  Taylor also admitted to sleeping in a written statement, stating that she was "dozing off to sleep."[20]

On January 21, 2020, Juncker completed a form to extend Wilkerson's probationary period to August 2020.[21]  Juncker, as the appointing authority, was responsible for ensuring that Wilkerson was aware of her probationary extension, but he did not discuss the extension directly with her or provide her with a copy of the extension form.[22]

On February 11, 2020, Trosclair completed Wilkerson's probationary employee performance evaluation.[23]  Trosclair rated Wilkerson's performance as "below expectations," the lowest rating available.[24]  Wilkerson received a "zero" rating in the safety category on her evaluation due to what Trosclair observed during the January 13, 2020 surprise visit, including that Trosclair caught Bailey and Taylor, Wilkerson's

---

[18] *Id.* at ¶ 12.  Jefferson Parish's statement of material facts does not specify the first name of officer Taylor.  *Id.*  The cited portion of the deposition transcript indicates that her full name is "Jacklyn Taylor."  *See* R. Doc. No. 60-5, at 147.  But the Court presumes her first name is spelled "Jacqueline" based on her handwritten statement. *Id.* at 179.

[19] *Id.* at ¶ 13.

[20] *Id.* at 4 ¶ 14.

[21] R. Doc. No. 62-22.

[22] R. Doc. No. 60-3, at 17–18.

[23] R. Doc. No. 60-2, at 4 ¶ 15.

[24] *Id.*

subordinates, asleep.[25]    The evaluation also noted that the cameras showed that Wilkerson did not make her first supervisory round until approximately 4:20 A.M., though she arrived at 11:56 P.M.[26]    The evaluation further noted that the other overnight supervisor, Silby, stated that Wilkerson regularly sleeps on duty during at least one of three shifts they work together.[27]

Trosclair indicated on the performance evaluation form that "[a]lert and vigilant supervision of both staff and residents is needed in order to ensure that all are kept safe," and that "due to the lack of proper supervision on the part of this overnight supervisor [a detention officer] slept for significant periods of time[.]"[28] Under Jefferson Parish policy, neither detention officers nor supervisors are allowed

---

[25] *Id*. at ¶ 16.

[26] *Id*. Wilkerson objects to the accuracy of the evaluation with respect to when she performed her first round on the night of January 13, 2020. R. Doc. No. 62-23, at 2. Specifically, Wilkerson states that she performed her first round when she arrived at work that evening. *Id*. *See also* R. Doc. No. 60-4 (Wilkerson deposition transcript), at 78 (noting that Wilkerson performed her rounds "as soon as [she] got there" around midnight).    On summary judgment, the Court is bound to credit Wilkerson's testimony. *Anderson*, 477 U.S. at 255.  However, even though Wilkerson states that she performed her rounds as soon as she arrived, Trosclair's commentary in her evaluation does state that "[t]he cameras that evening showed that the employee did not make her first supervisory round until approximately 4:20 am, though she arrived for work at 11:56 pm that night." R. Doc. No. 60-3, at 149.

As part of her opposition to Jefferson Parish's motion for summary judgment, Wilkerson submitted, labeled as Exhibit G, the audio recording of her pre-disciplinary hearing ("Exhibit G").  *See* R. Doc. No. 62-1 (notice of manual submission).  During that hearing, when questioned about her rounds, Wilkerson answers, "[w]e might not have done that many rounds.  I'll take my lick."  *See* Exhibit G at 15:29 (on file with the Court).  The Court accepts Wilkerson's later deposition testimony as the truth, but it discusses her pre-disciplinary hearing statement below.

[27] R. Doc. No. 60-2, at 4 ¶ 16.

[28] *Id*. at ¶ 17. *See also* R. Doc. No. 60-3, at 149.

to sleep on the job.[29]   Further, Wilkerson conceded that performing rounds is necessary for the safety of the juveniles and to set an example for employees as a supervisor.[30]  The evaluation also notes that Wilkerson "failed to document properly incidents and decisions related to an employee that [Wilkerson] caught sleeping on duty multiple times."[31]

On February 11, 2020, Wilkerson received correspondence from Juncker setting a pre-disciplinary hearing for February 13, 2020 as a result of her "below expectations" evaluation.[32]  Following her performance evaluation and receipt of the notice for her pre-disciplinary hearing, on February 12, 2020, Wilkerson completed an employee grievance form regarding Trosclair.[33]

On February 13, 2020, Wilkerson attended her pre-disciplinary hearing in which Juncker discussed Wilkerson's performance evaluation with her.[34]   On February 17, 2020, Wilkerson sent an email to Juncker in which she offered additional information about the instances discussed in her performance review,

---

[29] R. Doc. No. 60-2, at 5 ¶ 20.

[30] *Id*. at 4 ¶ 18.

[31] R. Doc. No. 60-3, at 146.   Wilkerson's performance evaluation also describes problems with Wilkerson staying organized, documenting incidents properly, making sound decisions as a supervisor, and being a consistent leader.  R. Doc. No. 60-2, at 5 ¶ 19.

[32] R. Doc. No. 60-2 at 5 ¶ 21.

[33] *Id*. at ¶ 22.

[34] *Id*. ¶ 23.  Wilkerson submits that she was repeatedly interrupted and not permitted to respond during her pre-disciplinary hearing.  R. Doc. No. 62-23, at 3.  Wilkerson references the hearing audio "in globo," without citing to specific instances.  *Id*.  After listening to the entire audio recording, the Court credits Wilkerson that at certain times, Juncker does talk over Wilkerson as she is providing responses.

including how often she made rounds.[35]  In this email, Wilkerson stated that Trosclair

is "arrogant, egotistical, and very disrespectful […] especially pertaining to women."[36]

Wilkerson further stated that Trosclair treats her and Silby "differently than he

[treats] our supposed to be equal male supervisors."[37]  On February 18, 2020, Juncker

made the decision to terminate Wilkerson's probationary employment effective the

next day, February 19, 2020.[38]

In her amended complaint,[39] Wilkerson files claims for sex and race

discrimination and retaliation against Jefferson Parish pursuant to Title VII of the

Civil Rights Act of 1964 as well as the Louisiana Employment Discrimination Law

("LEDL"), La. R.S. 23:301, *et seq.*   Wilkerson also asserts a claim for race

discrimination pursuant to 42 U.S.C. § 1981.[40]

---

[35] R. Doc. No. 60-3, at 161–163.

[36] *Id.* at 163.

[37] *Id.*

[38] R. Doc. No. 60-2, at 5 ¶ 24.  In a termination letter dated February 19, 2020, Juncker advised Wilkerson that he concurred with the ratings contained in her evaluation, which identified several problems in the categories of "safety," "communications," "decision making," and "supervision and management." R. Doc. No. 60-3, at 145–147.  Ultimately, Juncker wrote that Wilkerson's performance was "below expectations," and that she "was unable or unwilling to perform [her] duties satisfactorily," which warranted termination.  *Id.* at 147.

[39] R. Doc. No. 33.

[40] All claims against Juncker and Trosclair were previously dismissed by this Court. *See* R. Doc. No. 43.  *See also Bellue v. Gautreaux*, 782 F. App'x 350, 351 (5th Cir. 2019) ("Title VII does not extend even to a public official sued in his official capacity."); *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 381 n.1 (5th Cir. 2003) ("Individuals are not liable under Title VII in either their individual or official capacities.").

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact.  *See* Fed. R. Civ. P. 56.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case.  *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence[.]" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

### III. LAW AND ANALYSIS

As stated, Wilkerson argues three claims under Title VII against Jefferson Parish: discrimination based on her sex[41] and race,[42] and retaliation.[43] Wilkerson also argues parallel state law claims[44] under the LEDL and a claim for race discrimination pursuant to 42 U.S.C. § 1981.[45] The Court addresses each claim in turn.

---

[41] R. Doc. No. 33, at 15 ("Count 2 […] Disparate Treatment – Gender").
[42] *Id.* at 16 ("Count 3 […] Disparate Treatment – Race").
[43] *Id.* at 17 ("Count 4 […] Retaliation").
[44] *Id.* at 18 ("Count 5 State Law Discrimination based on Race and Gender and Retaliation").
[45] *Id.* at 14 ("Count 1 Violation of 42 U.S.C. §1981 and 1983").

## A.     Title VII Sex Discrimination Claim[46]

Wilkerson argues that, by terminating her employment in February 2020, Jefferson Parish engaged in gender discrimination made unlawful under Title VII. Jefferson Parish argues, and Wilkerson tacitly concedes,[47] that the *McDonnell Douglas* burden-shifting analysis applies to Wilkerson's claims.    *See McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973).

When there is no direct evidence of discrimination, as in this case, courts apply the burden-shifting test established by *McDonnell Douglas* to determine whether an employer is liable for employment discrimination under Title VII. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (explaining that *McDonnell Douglas* and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases.").

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.   If the plaintiff succeeds, the

---

[46] Wilkerson filed two distinct Title VII claims: one for sex discrimination and one for race discrimination.   The Court addresses her race discrimination claim below. However, because both Wilkerson and Jefferson Parish present concurrent arguments with respect to Wilkerson's sex and race discrimination claims, the Court notes some details here that are relevant to its race discrimination analysis.

[47] R. Doc. No. 60-1, at 10.  *See also* R. Doc. No. 62, at 4–22. Although Wilkerson does not expressly concede that the *McDonnell Douglas* framework applies, *id.*, nowhere in her opposition does she argue that direct evidence of discrimination exists in this case.   Her entire argument is patterned on the *McDonnell Douglas* framework. Moreover, Wilkerson presents her sex and race discrimination arguments together. *Id.* at 4 ("Race and Sex Discrimination Claims").  Wilkerson does not argue that the analysis differs in any way for these two claims.

burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id*. Finally, if the employer offers such a justification, the plaintiff must demonstrate that the defendant's proffered reason is merely a pretext for discrimination. *Id*. at 804. Ultimately, the burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 259 (5th Cir. 2011) ("The employer's burden is one of production, not persuasion, and does not involve a credibility assessment.").

### 1. Wilkerson fails to show a *prima facie* case of sex discrimination.

To survive summary judgment on her sex discrimination claim, Wilkerson must put forth sufficient evidence to make a *prima facie* case that (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the employer; and (4) she was treated less favorably than—or was replaced by—other similarly situated employees outside the protected group.  *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

The parties agree that Wilkerson, a female, is a member of a protected class.[48] Jefferson Parish does not dispute that Wilkerson was qualified for her position at Rivarde.[49]  Further, Jefferson Parish does not contest that her termination was an

---

[48] R. Doc. No. 60-1, at 11.
[49] *Id.*

adverse employment action.[50]  However, Jefferson Parish does argue that Wilkerson cannot demonstrate a *prima facie* case of discrimination based on the fourth element noted above.[51]

> ### (a)  Wilkerson's position was filled by another employee who shares her protected characteristics.

Jefferson Parish submits that, following Wilkerson's termination, Juncker filled her vacant position with another African-American woman, Katina Bills ("Bills").[52]  Juncker, the appointing official responsible for hiring and firing employees, directly testified in his deposition that he filled Wilkerson's position with Bills and that she is excelling in that role.[53]  Wilkerson responds that Eric Vicks ("Vicks") and Kynan Davis ("Davis"), two men, are the supervisors who now work the night shift to which she was previously assigned.[54]  Wilkerson argues that the assignment of Wilkerson's shift to two men presents a genuine issue of material fact as to whether Wilkerson was replaced by Bills or Vicks and Davis.[55]  Jefferson Parish

---

[50] *Id.*  Wilkerson's opposition focuses exclusively on her termination as the adverse employment action for this analysis.  R. Doc. No. 62, at 5 n.10 (citing to Jefferson Parish's concession that Wilkerson "suffered an adverse employment action through her termination"), 15 (discussing "whether Wilkerson was fired because of her race and/or sex").

[51] *Id.*

[52] *Id.* (citing R. Doc. No. 60-3 (Juncker Deposition) at 131).

[53] R. Doc. No. 60-3, 130–131.

[54] R. Doc. No. 62, at 6.

[55] *Id.*  Wilkerson also points to Wilkerson's co-worker Silby who was demoted from supervisor to detention officer before Bills was promoted to supervisor.  *Id.* at 5. Wilkerson emphasizes the testimony of manager Ralph Sacks ("Sacks") that Bills was a detention officer in December 2019 and then was promoted "to the same supervisor position as Wilkerson." *Id.*  It is not apparent how Sack's testimony could create a genuine issue of material fact when it corroborates Juncker's testimony that Bills was

replies that Wilkerson fails to present affirmative evidence challenging Juncker's testimony that Bills filled Wilkerson's open position after Wilkerson's departure.[56]

Based on the summary judgment record, the identity of the person who took Wilkerson's vacant position is a simple question of fact. Jefferson Parish offers testimony from Juncker, the appointing official, directly stating that Bills took Wilkerson's vacant position.[57] Wilkerson offers no evidence that attempts to affirmatively contradict Juncker's statement.[58] Wilkerson attempts to demonstrate a genuine issue of material fact by showing that Silby, who held the same rank as Wilkerson, was demoted between Wilkerson's termination and Bills' promotion, and that two men now work the shift that Wilkerson supervised.[59] But Wilkerson's evidence is not inconsistent with Juncker's explanation that Bills took Wilkerson's position; nor has Wilkerson shown that she was hired specifically to work the night shift, or that employees do not rotate among shifts (as Wilkerson did when she was transferred from the day shift to the night shift).[60]

Ultimately, Wilkerson has not adduced any evidence that Bills "was not [Wilkerson's] true replacement upon discharge, but instead a temporary replacement to avoid liability" for discrimination. *Mehn v. Professional Const. Svcs., Inc.*, No. 95-

---

hired to replace Wilkerson. Further, Sacks testifies that Juncker is the appointing officer responsible for making hiring and firing decisions.

[56] R. Doc. No. 64-2, at 5.

[57] R. Doc. No. 60-3, at 131–132.

[58] R. Doc. No. 62, at 5–6.

[59] *Id.*

[60] *Id.* at 5–6, 8. In her objections to Jefferson Parish's statement of material facts, *see* R. Doc. No. 62-23, Wilkerson specifically notes that she did work on the day shift at the start of her employment. *Id.* at 2 (citing R. Doc. No. 60-4, at 55–56).

3125, 1997 WL 10247, at *4 (E.D. La. Jan. 13, 1997) (Clement, J.). Wilkerson at best creates "'some metaphysical doubt as to the material facts,'" with "only a 'scintilla' of evidence[.]" *Little*, 37 F.3d at 1075 (citations omitted). This speculative showing is insufficient to withstand summary judgment.

> **(b)** **Wilkerson fails to identify any similarly situated employees outside her protected class who were treated more favorably.**

As an alternative argument, Wilkerson presents several co-workers who she contends are similarly situated employees outside her protected class who received more favorable treatment than she did.[61] Jefferson Parish counters that Wilkerson's proposed comparators are not actually similarly-situated.[62]

Plaintiffs filing Title VII discrimination claims using circumstantial evidence under *McDonnell Douglas*, 411 U.S. 792, must "identify at least one coworker outside of [their] protected class who was treated more favorably 'under nearly identical circumstances.'" *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). This coworker is known as a "comparator." *Id.* A failure to identify a potential comparator "alone justifies dismissal of [a plaintiff's] Title VII claim." *Id.* at 427. If no such comparator exists, the plaintiff cannot establish a *prima facie* case. *See id.* (holding that a plaintiff who acknowledged that he was the only employee with a particular

---

[61] R. Doc. No. 62, at 6–15.
[62] R. Doc. No. 64-2, at 1–4.

14

negative performance evaluation and to have been placed on a performance plan "cannot prove that he was treated less favorably than others 'similarly situated'").

"For a comparator to be deemed similarly situated, the employees being compared should 'h[o]ld the same job or responsibilities, share[] the same supervisor or ha[ve] their employment status determined by the same person and have essentially comparable violation histories.'" *Wallace v. Seton Family of Hospitals*, 777 F. App'x 83, 87–88 (5th Cir. 2019) (quoting *Lee*, 574 F.3d at 260) (footnotes omitted) (alterations in original). Moreover, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.* (quoting *Lee*, 574 F.3d at 260 (citation omitted)); *see Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (finding that the district court erred by instructing the jury that "comparably serious misconduct was by itself enough to make employees similarly situated"). "However, 'nearly identical' should not be interpreted to mean 'identical.'" *Wallace*, 777 F. App'x at 87–88 (citing *Lee*, 574 F.3d at 260).

Wilkerson identifies five employees that she contends are similarly situated, valid comparators: Christopher Bruno ("Bruno"), Lynn Shields ("Shields"), Stanley LeBlanc ("LeBlanc"), Terrence Dixon ("Dixon"), and Violet Troulliet ("Troulliet"). The Court addresses each in turn.

On December 23, 2017, Bruno was demoted from the position of manager to supervisor for failing to respond to complaints made by Kimberly Weber ("Weber")

about discrimination related to Weber's race and sexual orientation.[63]  As a result of
Bruno's inaction, Jefferson Parish paid a settlement to Weber, and Juncker
considered Bruno's failures to be "gross work misconduct."[64]  On December 13, 2018,
after working almost a year as a supervisor, Juncker rated Bruno's performance to
be "below expectations."[65]  While Bruno received a score of "two" ("meets
expectations") in a number of categories, including safety, he received a score of "zero"
("below expectations," the lowest available rating) in supervision and management.[66]

Wilkerson first contends that Bruno is similarly situated because he was a
supervisor when he received a "below expectations" evaluation, which was the same
position and rating that Wilkerson received.[67]  It appears from the parties' arguments
that Bruno is a Caucasian male,[68] and that he is therefore outside Wilkerson's
protected class.  Jefferson Parish counters that Bruno, an employee with decades of
experience who was demoted due to disciplinary reasons, is not the same as
Wilkerson, a six-month employee.[69]

---

[63] R. Doc. No. 62-6, at 1.

[64] *Id.*

[65] R. Doc. No. 62-9, at 8.

[66] *Id.* at 2–4, 8.

[67] R. Doc. No. 62, at 8.

[68] Wilkerson cites to "Defendants [sic] Supplemental Responses to Discovery, attached as Exhibit K, a [sic] p. 19." *See* R. Doc. No. 62, at 6 n.17.  Among the various documents that Wilkerson submitted, there is not an item labeled "Exhibit K."  Based on Wilkerson's other labels, it appears that exhibit K should be R. Doc. No. 62-5, as this item follows R. Doc. No. 62-4, which is labeled as "Exhibit J."  The cited page in R. Doc. No. 62-5 does not establish that Bruno is Caucasian.  However, Jefferson Parish does not dispute that assertion in its reply brief.  R. Doc. No. 64-2, at 1–2.

[69] R. Doc. No. 64-2 at 1–2.

In general, employee seniority is a valid factor that this Court may consider when distinguishing among employees. *See, e.g., California Brewers Ass'n v. Bryant*, 444 U.S. 598, 606 (1980) (explaining that Title VII permits seniority systems which allot "to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase."); *AT&T Corp. v. Hulteen*, 556 U.S. 701, 708 (2009) (same); *Ballou v. Mabey*, 124 F. App'x 236, 240 (5th Cir. 2005) (holding that an employer's decision not to offer a vacant position to an African-American employee on the ground that he had least seniority was not pretext for racial discrimination); *Kendall v. Block*, 821 F.2d 1142, 1147 (5th Cir. 1987) (stating that employees at different levels of seniority and at different pay scales are not similarly situated).

Wilkerson argues that, following Bruno's demotion for misconduct,[70] Bruno automatically began his new supervisor position for a probationary period under Jefferson Parish employment rules, just like Wilkerson.[71] However, Bruno's overall length of employment—25 years—supports the fact that he was not similarly situated to Wilkerson.[72] Moreover, Bruno received a score of "two" ("meets expectations") for

---

[70] As discussed above, Bruno was a manager—not a supervisor—when he ignored Weber's complaints about discrimination. Wilkerson does not present any evidence that Bruno's misconduct as a manager relates to a safety issue or permitting subordinates to sleep while at work. R. Doc. No. 62, at 6–8.

[71] *Id.*

[72] R. Doc. No. 60-3, at 100 ("because of [Bruno's] tenure and many years with this agency, [Juncker] took all that into consideration" and "that's why he was not terminated); *id.* at 130–131 (stating that Bruno's 25 years of employment was a factor in his discipline).

the safety criteria in his 2018 performance evaluation.[73]  Wilkerson received a score

of "zero" ("below expectations," the lowest available) in this category.[74]  In addition to

these different rankings, Juncker identified other factors that distinguished Bruno

and Wilkerson in Juncker's assessment, including that Bruno was willing to admit

his faults and attempt to correct them while Wilkerson would not, and that Juncker

did not find many of Wilkerson's statements at the pre-disciplinary hearing to be

credible.[75]  Bruno is therefore not a similarly situated employee.  *Wallace*, 777 F.

App'x at 87–88.

Wilkerson next identifies Shields, who appears to be a Caucasian female, as a

comparator.[76]  Wilkerson submits that Shields' excessive tardiness (seventy-four

times in a calendar year) establishes that she is similarly situated because Shields'

---

[73] R. Doc. No. 62-5, at 5.

[74] R. Doc. No. 60-3, at 155.  Overall, Bruno ranked higher than Wilkerson in the categories of "safety" and "communication," but lower than her in the categories of "quality of work," and "reliability."  *Compare* R. Doc. No. 62-5, at 11 *with* R. Doc. No. 60-3, at 155.  As to the comments for the safety category, Bruno received no criticism. R. Doc. No. 62-5, at 5.  However, Wilkerson's evaluation stressed that she must be an attentive supervisor because at night residents "could use the time in their rooms to hurt or kill themselves."  R. Doc. No. 60-3, at 149.  Although the Court does not consider these performance rankings to be dispositive on their own, these differences in ranking do weigh against a finding that Bruno and Wilkerson are similarly situated employees.

[75] R. Doc. No. 60-3, at 25, 34–36, 130–131.

[76] Wilkerson identifies Shields as "Lynn Shields (WF)."  R. Doc. No. 62, at 6. Wilkerson does not explain what the notation "WF" means.  The Court assumes those letters mean "White Female."  Wilkerson again cites to Exhibit K, but no such exhibit is included with her summary judgment materials.  Jefferson Parish does not appear to challenge in its reply brief that Shields is a Caucasian female, and the Court proceeds with its analysis on that premise.

evaluation admonishes that her lack of punctuality "hinders her ability to supervise her subordinates."[77]

Overall, Shields received a "zero" rating—the lowest available—for attendance, but Wilkerson received a "two"—the highest possible for attendance. Wilkerson received a "zero" rating for safety while Shields received a "two." Wilkerson scored a "one" in communication while Shields received a "three" ("exceeds expectations"—the highest available for communication). Wilkerson received a "one" in decision making while Shields received a "two." Wilkerson received a "zero" in supervision and management while Shields received a "two."[78]  Further, Shields' evaluation does not allege that she permitted subordinates to sleep during their shift.[79]  This difference in ranking across various categories—coupled with the lack of any allegation that Shields allowed the staff she supervised to sleep on duty— precludes Wilkerson's conduct from being "'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."  *Wallace*, 777 F. App'x at 88.  Shields is therefore not a similarly situated employee.

Wilkerson next advances Dixon, an African-American man, and LeBlanc, a Caucasian man, who she contends received more favorable treatment because they

---

[77] R. Doc. No. 62, at 12–13.
[78] *Compare* R. Doc. No. 60-3, at 155 (Wilkerson final evaluation) *with* R. Doc. No. 62-13, at 9 (Shields final evaluation).
[79] R. Doc. No. 62-13, at 2–10.

resigned rather than be disciplined for misconduct.[80]  Wilkerson contends that "[s]uch leniency was not provided to [her]."[81]

First, Wilkerson testified that she could have resigned before any discipline was rendered, but she chose not to do so.[82]  Next, as to Dixon, Wilkerson has offered no record evidence supporting her claim.[83]  Further, LeBlanc was not a probationary employee like Wilkerson; Juncker testified that "[LeBlanc] was not a probationary employee.   He was a tenured employee."[84]   Under Fifth Circuit precedent, probationary employees are not similarly-situated to permanent or non-probationary employees.  *Thomas v. Johnson*, 788 F.3d 177, 180 (5th Cir. 2015) (collecting cases).

Lastly, Wilkerson contends that Troulliet received more favorable treatment because she, in contrast to Wilkerson, "was not disciplined for splitting rounds or for not performing required rounds."[85]   Jefferson Parish emphasizes that Troulliet "retired from Jefferson Parish on July 31, 2020 after being employed [there] since November 1997."[86]   For the same reasons as mentioned for Bruno and LeBlanc, Wilkerson is not similarly situated to Troulliet, a non-probationary employee with decades of experience.  Further, Wilkerson was not terminated solely for her failure

---

[80] R. Doc. No. 62, at 13–15.

[81] *Id*. at 14.

[82] R. Doc. No. 60-4, at 191.

[83] R. Doc. No. 62, at 15, n.48 (citing to "Exhibit K," which is not included with Wilkerson's opposition materials).   The Court has reviewed each of Wilkerson's exhibits, and it can find no support for the facts that she presents with respect to Dixon.

[84] R. Doc. No. 60-3, at 116.

[85] R. Doc. No. 62, at 15.

[86] R. Doc. No. 60-1, at 15.  *See also* R. Doc. No. 60-3, at 164. R. Doc. No. 60-8.

to complete rounds; Jefferson Parish offers other performance problems, like Wilkerson's failure to document verbal warnings to her subordinates. These differences preclude Wilkerson and Troulliet from having essentially comparable violation histories.

Overall, Wilkerson fails to identify a similarly situated employee outside her protected class who received more favorable treatment. Coupled with her failure to demonstrate that she was replaced by someone outside her protected class, Wilkerson cannot establish a *prima facie* case of sex discrimination. However, even if Wilkerson could prevail at the *prima facie* stage, her claim would still fail, as explained below.

### 2. Jefferson Parish offers legitimate reasons for Wilkerson's termination.

If the plaintiff succeeds at establishing a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Black*, 646 F.3d at 259 (5th Cir. 2011) ("The employer's burden is one of production, not persuasion, and does not involve a credibility assessment.").

Jefferson Parish offers Wilkerson's "well-documented performance issues during her probationary period."[87] Jefferson Parish specifies that Trosclair observed detention officers sleeping on the night shift when Wilkerson was on duty, and that this incident contributed to Wilkerson's "below expectations" performance rating.[88] Juncker ultimately cited this reason, among others, as justification in Wilkerson's

---

[87] R. Doc. No. 60-1, at 18.
[88] *Id.* at 19.

termination letter.[89]  This explanation offers legitimate, non-discriminatory reasons for Wilkerson's termination.

### 3.     Wilkerson does not present sufficient evidence of pretext.

"Once [Jefferson Parish] produces a legitimate, non-discriminatory reason for firing [Wilkerson], the presumption of discrimination disappears and [Wilkerson] 'bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that [Jefferson Parish] intentionally discriminated against her because of her protected status.'" *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)).  "To do so, [Wilkerson] 'must put forward evidence rebutting each of the nondiscriminatory reasons [Jefferson Parish] articulates.'" *Id.* (quoting *Wallace*, 271 F.3d at 220). "[Wilkerson] may use two alternative methods to show that there is a genuine issue of material fact as to whether she was fired because of her [sex]: pretext and mixed-motive." *Id.* (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).[90]

"A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  *Thomas*, 788 F.3d at 179 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003)).  Wilkerson raises both lines of argument.

---

[89] R. Doc. No. 60-3, at 145–147.

[90] Wilkerson cites to *Vaughn*, 655 F.3d at 637, for the proposition that she may present a pretext or mixed-motive theory.  R. Doc. No. 62, at 15.  However, Wilkerson's entire argument attempts to demonstrate that Jefferson Parish's "proffered explanation is false or unworthy of credence." *Id.* at 22.  Accordingly, Wilkerson does not present a mixed-motive argument, and the Court need not analyze that approach here.

> **(a)** **Wilkerson has not demonstrated disparate treatment because Bruno is not a similarly situated employee.**

Wilkerson mainly attacks Jefferson Parish's stated reasons for her termination, but she also contends that Bruno, an employee with "decades of experience," failed to properly complete a report and that he was permitted to retake additional training when he scored a "one" in the decision-making field on his performance review.[91]

In the context of a pretext analysis, "[d]isparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct." *Vaughn*, 665 F.3d at 637 (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)).  To succeed under this theory, the proffered employees must be appropriate comparators.  *Id*.; *see also Lee*, 574 F.3d at 259–260 (providing that employees with different supervisors, different work responsibilities, or dissimilar violations are generally inappropriate comparators).

As the Court discussed in connection with Wilkerson's *prima facie* case of discrimination, *see* Section III(A)(1)(b) above, Bruno is not a similarly situated employee.  Bruno has decades more experience with Jefferson Parish than Wilkerson, and his conduct did not include an allegation of permitting subordinates to sleep on the job.  For these same reasons, Wilkerson cannot establish pretext by relying on a theory of disparate treatment via Bruno.

---

[91] R. Doc. No. 62, at 20.

### (b)   Wilkerson has not demonstrated that Jefferson Parish's proffered explanation is false or unworthy of credence.

The crux of Wilkerson's pretext argument is that Jefferson Parish's "proffered explanation is false or unworthy of credence."[92] "If the employer offers more than one [nondiscriminatory] reason [for the adverse employment action], the plaintiff 'must put forward evidence rebutting *each* of the nondiscriminatory reasons the employer articulates.'" *Jones v. Gulf Coast Restaurant Group, Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quoting *Wallace v. Methodist Hops. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)) (emphasis added in *Jones*). "What's more, the plaintiff must produce 'substantial evidence' of pretext." *Id*. at 369. (quoting *Wallace*, 271 F.3d at 220). "The quality and weight of the evidence determines whether it is substantial." *Id*. "In deciding whether summary judgment is warranted, a court should consider, among other things, 'the probative value of the proof that the employer's explanation is false' and 'any ... evidence that supports the employer's case.'" *Id*. (quoting *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577–78 (5th Cir. 2020), and *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 878–879 (5th Cir. 2019)).

Lastly, an employee cannot merely contest the accuracy of an employer's perception of poor employee performance to avoid summary judgment. *See Thomas*, 788 F.3d at 179; *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); *Waggoner v. City of*

---

[92] R. Doc. No. 62, at 22.

*Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993) (holding that, to the extent a plaintiff's summary judgment evidence relates to his innocence of an accusation, such evidence is "irrelevant. He must, instead, produce evidence demonstrating that [the employer] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate").

Wilkerson enumerates several reasons allegedly supporting her argument that her performance evaluation is inaccurate, but she does not actually address each reason that Jefferson Parish includes in her termination letter.[93]  Wilkerson states that she performed a round at the Rivard facility as soon as she arrived for her January 13, 2020 shift; that Silby was not asleep in the office with Wilkerson during that shift and that Wilkerson "dozes," but she does not in fact sleep on duty.[94]  However, Wilkerson has offered no evidence disputing the fact that she failed to ensure that the employees she supervised were not sleeping on the job.[95]  The record evidence demonstrates that two employees, Bailey and Taylor, were sleeping when Wilkerson was on duty as their supervisor.[96]  As Juncker restates in Wilkerson's termination letter, "[a]s one of two supervisors assigned to the overnight shift," Wilkerson needed to ensure "alert and vigilant supervision of *both staff and*

---

[93] R. Doc. No. 62, at 17–22.
[94] *Id.* at 17–19.
[95] *Id.*
[96] R. Doc. No. 60-5 at 177 (hand-written statement of Daniell Bailey, conceding that "I appear to have fallin [sic] asleep."), & 178 (hand-written statement of Jacqueline Taylor, conceding that her medication may have been "a factor in my dozing off to sleep.").

*residents*."[97]  Wilkerson fails to offer any evidence, let alone substantial evidence, that this reason is unworthy of credence.  *Jones*, 8 F.4th at 368.

Further, Wilkerson testified in her deposition that she did actually perform a supervisory round when she arrived for her shift on the morning of January 13, 2020.[98]  But during her pre-disciplinary hearing, Wilkerson did not explain that fact to Juncker.  Instead, she conceded that "[w]e might not have done that many rounds. I'll take my lick."[99]

Next, Wilkerson's termination letter adopted Trosclair's criticism that Wilkerson "failed to document properly incidents and decisions related to an employee that [Wilkerson] caught sleeping on duty multiple times between November 2019 and January 2020."[100]  To rebut this reason, Wilkerson argues that she "provided several emails to Trosclair concerning the issues she had with Bailey and

---

[97] R. Doc. No. 60-3, at 146 (emphasis added).

[98] R. Doc. No. 62-23, at 2.

[99] *See* Exhibit G at 15:29 (on file with the Court).  Wilkerson offers no evidence that Juncker relied on her admission, even if it was incorrect, as a bad faith excuse to justify discrimination.  *Thomas*, 788 F.3d at 179; *Mayberry*, 55 F.3d at 1091; *Waggoner*, 987 F.2d at 1166.

Similarly, Wilkerson's termination letter states that, during the pre-disciplinary hearing, she "admitted that [she] doze[s], but [she] bring[s] [her] personal laptop to work and [she] do[es] homework to stay awake.  [Wilkerson] further affirmed that dozing and sleeping are not the same."  R. Doc. No. 60-3, at 145.  In her deposition testimony, Wilkerson maintained that she did not sleep on the job, but that "dozing" is "a long-term glaze […] almost like microsleep."  R. Doc. No. 60-4, at 260.  In the pre-disciplinary hearing, Juncker found Wilkerson to be "deceptive in her responses," and Wilkerson's explanation "just didn't make any sense."  R. Doc. No. 60-3, at 35–36.  Even if Juncker's assessment was erroneous, Wilkerson has not provided evidence that his "decision was made with a discriminatory motive."  *Mayberry*, 55 F.3d at 1091.

[100] R. Doc. No. 60-3, at 146.

seeking guidance on how to proceed."[101]   However, the referenced emails only substantiate, rather than refute, Trosclair's criticism.[102]   For instance, in one email, Wilkerson admits that she did not retain "the exact days that [officer Baily] has been [advised] that she [was] sleeping," even though Wilkerson had given her three verbal warnings.[103]   Further, even though Wilkerson was "aware of [her] responsibility" to document when she gives verbal warnings, Wilkerson "misplaced the information."[104] Later in the same email exchange, Wilkerson states that she had "been looking for the information," but she knew "it has been misplaced," and Wilkerson "believe[s] [she] accidentally threw it away."[105]

Even crediting Wilkerson's argument that she was "seeking guidance on how to proceed,"[106] these emails demonstrate that Wilkerson was aware of her duty to document verbal warnings and that she failed to do so.   Moreover, as these verbal warnings concern officer Bailey sleeping on the job—and Trosclair later discovered her sleeping on Wilkerson's shift—Wilkerson has not presented any evidence that Jefferson Parish's reason is false or unworthy of credence.

Because Wilkerson has failed to rebut "'*each* of the nondiscriminatory reasons the employer articulates,'" *Jones*, 8 F.4th at 368, her discrimination claim also fails on the pretext showing.

---

[101] R. Doc. No. 62, at 20.
[102] *See generally* R. Doc. No. 62-17.
[103] *Id*. at 7.
[104] *Id*. at 5.
[105] *Id*. at 2.
[106] R. Doc. No. 62, at 20.

**B.**     **Title VII Race Discrimination Claim**

Jefferson Parish and Wilkerson each present a single, concurrent argument for both Wilkerson's sex and race discrimination claims despite the fact that these grounds are distinct.[107]   Presented with this briefing, the Court has considered Wilkerson's race discrimination claim under the same standards set forth above for her sex discrimination claim.  Even though Wilkerson's claims are distinct, her race discrimination claim fails for the same reasons as her sex discrimination claim. Summary judgment is proper for Jefferson Parish because Wilkerson cannot make a prima facie case of race discrimination.  Wilkerson does not establish that her position was filled by an employee outside of her protected class.  Moreover, Wilkerson does not identify a similarly-situated employee outside her protected class who received more favorable treatment.  Even assuming *arguendo* that she could do so, Wilkerson cannot demonstrate that Jefferson Parish's stated reasons for her termination are actually a pretext for race discrimination.

Finally, as to both her race and sex discrimination claims, Jefferson Parish argues that although Juncker ultimately fired Wilkerson, she "was recommended for hire by Trosclair and hired by Juncker, belying a discriminatory animus."[108] Wilkerson does not respond to this argument in her opposition.

---

[107] *See, e.g.*, R. Doc. No. 60-1, at 9 ("Wilkerson cannot establish claims for sex or race discrimination against Jefferson Parish."); R. Doc. No. 62, at 4 ("Race and Sex Discrimination Claims").
[108] R. Doc. No. 60-1, at 35.

"The same actor inference creates a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue." *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421–422 (5th Cir. 2009).   In *Spears*, the Fifth Circuit cautioned that "the presumption created by the same actor inference is not irrebuttable." *Id.* (citing *Haun v. Ideal Industries, Inc.*, 81 F.3d 541, 546 (5th Cir. 1996)); *see also Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n.3 (5th Cir. 1997) (holding, on summary judgment, that when "the same actor hires and fires an employee, an inference that discrimination was not the employer's motive in terminating the employee is created.").

The Court does not consider the same-actor inference to be irrebuttable or dispositive in deciding Jefferson Parish's motion for summary judgment.   However, for reasons previously provided, the same-actor inference does weigh in favor of granting summary judgment.   Overall, this inference supports the conclusion that, even if Wilkerson could establish a *prima facie* case of sex or race discrimination, summary judgment is nevertheless appropriate because Wilkerson fails to demonstrate a genuine issue of material fact as to pretext.

## C.   Title VII Retaliation Claim

Wilkerson also has filed a Title VII retaliation claim, asserting that "she was retaliated against for voicing her opposition by complaining to her supervisors of discriminatory conduct."[109]   Wilkerson offers numerous instances where she

---

[109] R. Doc. No. 62, at 22.

expressed her concerns to Jefferson Parish without plainly explaining which events support her theory of retaliation, but the Court will address each instance in turn.

To demonstrate a *prima facie* case for a Title VII retaliation claim using circumstantial evidence,[110] "[a] . . . plaintiff must establish that (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)). Such a prima facie case "gives 'rise to an inference of retaliation.'" *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 427 (quoting *Shackleford v. Deloitte & Touche*, 190 F.3d 398, 408 (5th Cir. 1999)).

"The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action." *Id*. "Once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to 'demonstrate that the employer's [stated] reason is actually a pretext for retaliation.'" *Id*. (quoting *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013)). To demonstrate sufficient pretext to defeat a motion for summary judgment, the plaintiff must produce evidence that could lead a reasonable fact-finder to conclude that "the adverse [employment]

---

[110] Wilkerson does not explicitly identify the standard to apply to her retaliation claim, but she does cite two Fifth Circuit cases applying the *McDonnell Douglas* framework. *See* R. Doc. No. 62, at 24–25 n.81–82 (citing *Fierros v. Texas Dep't of Health*, 274 F.3d 187 (5th Cir. 2001) and *Shackleford v. Deloitte & Touche*, 190 F.3d 398, 408 (5th Cir. 1999)).

action would not have occurred 'but for'" the employee's decision to engage in an activity protected by Title VII. *Feist*, 730 F.3d at 454 (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

### 1.   Wilkerson demonstrates a *prima facie* case of retaliation.

### (a)   Wilkerson establishes one instance of activity protected by Title VII.

"Under Title VII's antiretaliation provision, protected activity can consist of either: (1) 'opposing any practice made an unlawful employment practice by [Title VII]' or (2) 'making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under [Title VII].'" *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e–3(a)) (alterations omitted and added).  The first of these prongs is known as the "opposition clause;" the second is known as the "participation clause." *See id.*[111]

---

[111] For the participation clause, protected activity includes events like filing a charge with the Equal Employment Opportunity Commission ("EEOC"). *See Rodrigue v. PTS Mgmt. Grp., LLC*, ___ F. Supp. 3d ___, ___, 2021 WL 3183404, at *15 (W.D. La. July 26, 2021).  However, "'[e]very Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause.'" *Rite Way*, 819 F.3d at 239 n.2 (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012)); *cf. Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (calling the participation clause "irrelevant" when no formal EEOC charge had been filed at the time of the alleged retaliatory discharge, even though the employee had complained internally of alleged race discrimination).

Wilkerson argues that "she was retaliated against for voicing her opposition by complaining to her supervisors of discriminatory conduct." R. Doc. No. 62, at 22. Further, she contends that her negative performance evaluation and subsequent termination "were taken to retaliate against Wilkerson for complaining about conduct she believed to be discriminatory and illegal." *Id.* at 24.  Because Wilkerson does not

The Fifth Circuit has repeatedly held that the opposition clause does not actually require the opposed conduct to, in fact, violate Title VII. Instead, it is "enough that [the plaintiff] reasonably believed the employment practice to be unlawful." *Id.* at 240 (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1137–40 (5th Cir. 1981)); *see Cuellar v. Southwest General Emergency Physicians, P.L.L.C.*, 656 F. App'x 707, 710 (5th Cir. 2016) (per curiam) ("[A] viable Title VII retaliation claim does not necessarily depend on a viable harassment or discrimination claim." (emphasis omitted)). While the reasonable belief standard is "in tension with the plain text" of the statute, *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 n.2 (5th Cir. 2013), it "remains good law." *Rite Way*, 819 F.3d at 240.

The Supreme Court has stated that "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize[;] to contend against; to confront; resist; withstand[.]'" *Crawford v. Metropolitan Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009) (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1957)) (internal citations and alterations omitted). The opposition must indicate that the plaintiff views the employment practice as discriminatory. *Breeding v. Dep't of Interior*, No. 14-948, 2015 WL 1809977, at *8 (E.D. La. Apr. 21, 2015) (Africk, J.) (finding that opposition clause was not satisfied where plaintiff did not explain how her opposition "implicated her protected status or how a 'reasonable

---

present any argument based on Title VII's participation clause, the Court does not discuss that prong further.

employer would have understood [it] to be an expression of opposition *to unlawful discrimination* at work'" (emphasis retained) (quoting *Stewart v. RSC Equip. Rental, Inc.*, 485 F. App'x 649, 652 (5th Cir. 2012))); *see also Stewart*, 485 F. App'x at 652 (affirming summary judgment as to allegation of retaliation because plaintiff's opposition to discrimination was 'indistinguishable from non-race-based grumbling by an employee' and 'had no racial element'); *Allen v. Envirogreen Landscape Professionals, Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017) ("In a claim of protected opposition, an employee must at least have referred to conduct that could plausibly be considered discriminatory in intent or effect, thereby alerting the employer of its discriminatory practices."). Complaints about a "hostile work environment" or "unfair treatment" must give the employer some notice of how the conduct is discriminatory. *See Tratree v. BP N. Amer. Pipelines, Inc.*, 277 F. App'x 390, 395 (5th Cir. 2008) (per curiam) (stating that, in the ADEA context, where the Fifth Circuit "uses the same standards of proof . . . as it does for Title VII[,] . . . [c]omplaining about unfair treatment without specifying why the treatment is unfair . . . is not a protected activity"); *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (per curiam) (upholding grant of summary judgment on retaliation claim where, "[i]n her appellate brief, Appellant [did] not allege that she specifically complained of racial or sexual harassment, only harassment").

Wilkerson points to numerous instances to support her retaliation claim. She first references conduct that began in October 2019 when she "advised Trosclair of

issues with staffing and safety" in a series of communications.[112]  Assuming *arguendo* that Wilkerson reasonably believed that her communications discussed an unlawful employment practice, her messages do not implicate her protected status or give any notice that Jefferson Parish's conduct was discriminatory.  *See Tratree*, 277 F. App'x at 395; *Harris-Childs*, 169 F. App'x at 916.  This failure forecloses the possibility that Wilkerson's communications about staffing and safety constitute protected activity.

Wilkerson next offers an email that she sent on January 15, 2020, "complaining of harassment and discrimination to Juncker, Sacks, and Trosclair."[113]  In one portion of this email, Wilkerson protests that an unnamed supervisor "bluntly shows favoritism towards certain staff and certain people," including employees that had previous experience at Rivarde.[114]  Wilkerson further states that this unnamed supervisor dislikes Wilkerson because she is an "OUTSIDER" who did not work her way up within the agency, and that Wilkerson was an external hire.[115]  Wilkerson later expresses that she is "tired of being retaliated and harassed" because she disagreed with her fellow supervisor "about the qualifications, pay and the hiring process."[116]  Wilkerson also "called this individual out for not being equally fair to all

---

[112] R. Doc. No. 62, at 22.  In the light most favorable to Wilkerson, she expressed in the underlying text messages and emails that the security protocols at Rivarde were lacking and that Jefferson Parish should do more to make all staff feel safe and secure at work. *See*, *e.g.*, R. Doc. No. 62-12, at 17.

[113] R. Doc. No. 62, at 23.  The underlying documents that Wilkerson references (R. Doc. No. 62-17) are a series of emails, but Wilkerson does not specific any particular message as protected activity.  *See* Doc. No. 62, at 23.

[114] R. Doc. No. 62-17, at 1 (capitalization in original).

[115] *Id*.

[116] *Id*. at 3.

staff."[117]  Further, Wilkerson objected to the fact that this supervisor did not think Wilkerson was "equal to them and allow their clique to treat me as such."[118]

Again, assuming *arguendo* that Wilkerson reasonably believed that her email discussed an unlawful employment practice, her comments do not implicate her protected status or give any notice that Jefferson Parish's conduct is discriminatory based on her sex or race, even if this unnamed supervisor shows favoritism towards employees who rise through the ranks internally.  *See Tratree*, 277 F. App'x at 395; *Harris-Childs*, 169 F. App'x at 916.  This failure again forecloses the possibility that Wilkerson's email messages constitute protected activity.

Wilkerson then references a grievance she filed against Trosclair on February 12, 2020.[119]  Wilkerson's grievance details that Trosclair "retaliated against [her] for not being cohesive with him" and refusing to agree that "another supervisor was sleeping in the office" while Wilkerson was present.[120]  Her grievance further relates that Trosclair met with Wilkerson and he posed "several inappropriate questions" to induce Wilkerson "to verbally agree with his remarks/comments and or suggestions."[121]  Again, assuming *arguendo* that Wilkerson reasonably believed that her grievance discussed an unlawful employment practice, her complaint does not implicate her protected status or give any notice that Trosclair's conduct—asking Wilkerson to substantiate an allegation against another employee—is discriminatory

---

[117] *Id.*
[118] *Id.*
[119] R. Doc. No. 62 at 23.
[120] R. Doc. No. 60-3, at 158.
[121] *Id.*

based on her sex or race.  *See Tratree*, 277 F. App'x at 395; *Harris-Childs*, 169 F. App'x at 916.

Wilkerson's next instance concerns her pre-disciplinary hearing conducted on February 13, 2021.  Wilkerson contends that "[m]ultiple times" during this hearing she "voiced further complaints about how [Trosclair] treats others differently."[122] Wilkerson's argument here is simply too vague.

Wilkerson provided the Court with the audio recording of the hearing. However, Wilkerson has not identified any particular comments that she made during the hearing or explained how her remarks might be protected activity.  Indeed, this argument cites absolutely no portion of the summary judgment record other than a blanket reference to the hearing.[123]  This tactic of generally referring to exhibits in the entirety is insufficient.  *Smith*, 391 F.3d at 625 (explaining that parties should include specific citations to summary judgment evidence); *Del Carpio Frescas*, 932 F.3d at 331 ("Judges are not like pigs, hunting for truffles buried in the record.") (quotation marks and citation omitted).  The Court declines to ferret out evidence that Wilkerson is responsible for presenting.

Finally, Wilkerson discusses an email about "discrimination from Trosclair" that she sent on February 17, 2020.[124]  In this email, Wilkerson states to Juncker that "Trosclair is arrogant, egotistical, and very disrespectful" in the way he interacts

---

[122] R. Doc. No. 62, at 23.
[123] *Id.*
[124] *Id.*

with people "especially pertaining to women."[125]  Wilkerson protests that Trosclair treats her and Silby "differently than he treat[s] our supposed to be equal male supervisors."[126]  Here, Wilkerson links her complaints about Trosclair's behavior to her protected status as a woman, *see Breeding*, 2015 WL 1809977, at *8, and Trosclair's conduct—treating male and female supervisors differently—could plausibly be considered discriminatory against women.  *Allen*, 721 F. App'x at 326.  Thus, as to her February 17, 2020 email, Wilkerson has provided evidence of protected activity by voicing her opposition to her supervisor about Trosclair's treatment of women.

### (b)    Wilkerson suffered an adverse employment action.

In the context of a retaliation claim, unlike that of a discrimination claim, Title VII "does not confine the actions and harms it forbid to those that are related to employment or occur at the workplace."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).  In *White*, the Supreme Court explicitly rejected the Fifth Circuit's "ultimate employment decision" standard, "which limit[ed] actionable retaliatory conduct to acts such as hiring, granting leave, discharging, promoting, and compensating."  *Id.* at 60, 67 (internal quotations and alterations omitted).  Instead, *White* held, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of

---

[125] R. Doc. No. 60-3, at 163.
[126] *Id.*

discrimination." *Id.* at 68 (internal quotation omitted); *see also id.* at 69 (adding that the standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances"). Courts in the Fifth Circuit have concluded that "a negative reference may constitute an adverse employment action." *Levitz v. Alicia's Mexican Grille, Inc.*, No. 19-3929, 2020 WL 710013, *3 (S.D. Tex. Feb. 11, 2020). Jefferson Parish does not dispute that Wilkerson's termination was an adverse employment action.[127]

### (c)   Wilkerson offers sufficient evidence of a causal link.

While a plaintiff pursuing a retaliation claim is required to "establish that . . . her protected activity was a but-for cause of the alleged adverse action" suffered, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), "the but-for standard does not apply at the *prima facie* case stage." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (quoting *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019)); *see Garcia*, 938 F.3d at 242 (describing as "binding circuit law" the statement that "*Nassar* did not alter the causation prong of the *prima facie* stage of retaliation analysis" (internal quotation and citation omitted)). Instead, to satisfy the third element of a *prima facie* retaliation case, a plaintiff need only offer evidence "demonstrat[ing] that the decision maker had knowledge of the protected activity." *See Tureaud*, 294 F. App'x at 914 (finding that evidence supported jury verdict on retaliation claim and that a jury could reasonably infer that the decision maker had knowledge of his assistant's conversation with plaintiff).

---

[127] R. Doc. No. 60-1, at 30.

If the protected activity and the adverse employment action are "very close" in time, that alone may establish a *prima facie* causal link. *See Thompson v. Somervell Cty.*, 431 F. App'x 338, 342 (5th Cir. 2011) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam). However, "even at the *prima facie* stage, temporal proximity can only establish a causal link when it is connected to the decision maker's knowledge of the protected activity." *Id.* (citing *Breeden*, 532 U.S. at 273; *Cothran v. Potter*, 398 F. App'x 71, 73–74 (5th Cir. 2010) ("The combination of temporal proximity and knowledge of a protected activity may be sufficient to satisfy a plaintiff's *prima facie* burden for a retaliation claim[.]"); *Ramirez v. Gonzales*, 225 F. App'x 203, 210 (5th Cir. 2007) ("Fifth Circuit precedent requires evidence of knowledge of the protected activity on the part of the decision maker and temporal proximity between the protected activity and the adverse employment action.")). The Fifth Circuit has held that two-and-a-half months is close enough to "establish causation." *Garcia*, 938 F.3d at 243.

Wilkerson has identified enough evidence to establish a causal link between her February 17, 2020 email and her termination. Wilkerson wrote the February 17, 2020 email directly to Juncker, the appointing official who terminated her employment. Upon receiving this email, Juncker decided to terminate Wilkerson's employment *the very next day*. This close temporal proximity, coupled with the fact that Juncker was directly aware of Wilkerson's email, is sufficient to demonstrate a causal connection under Fifth Circuit precedent. Therefore, Wilkerson has

established a prima facie case of retaliation supported by her email complaining of Trosclair's behavior towards women and her subsequent termination.[128]

## 2. Jefferson Parish offers legitimate reasons for Wilkerson's termination.

If the plaintiff succeeds at establishing a *prima facie* case of retaliation, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Alkhawaldeh*, 851 F.3d at 427.

Jefferson Parish again argues that it had legitimate reasons for Juncker's decision to terminate Wilkerson.[129]  As the Court has discussed above, Trosclair observed detention officers sleeping on the night shift when Wilkerson was on duty, and this incident contributed in part to Wilkerson's "below expectations" performance rating.[130]  Juncker ultimately cited this reason, among others, as justification in Wilkerson's termination letter.[131]  This explanation offers legitimate, non-retaliatory reasons for Wilkerson's termination.

## 3. Wilkerson fails to offer evidence of pretext for retaliation.

"Once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to 'demonstrate

---

[128] In her retaliation argument, Wilkerson emphasizes that her probationary period was extended, allegedly in violation of DJS policy.  R. Doc. No. 62, at 23.  Wilkerson argues this probation extension followed shortly after her January 15, 2020 email, which the Court determined above was not Title VII protected activity.  Because Wilkerson does not offer any evidence of a causal link between her probation extension and her February 17, 2020 email, the Court need not resolve whether her probation extension is an adverse employment action.

[129] R. Doc. No. 60-1, at 33.

[130] *Id*. at 19.

[131] R. Doc. No. 60-3, at 145–147.

that the employer's [stated] reason is actually a pretext for retaliation.'" *Alkhawaldeh*, 851 F.3d at 427 (quoting *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013)).

As with a discrimination claim, "'a plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 879 (5th Cir. 2019) (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)). "[I]n order to survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (quoting *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (internal quotation marks omitted)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Musser*, 944 F.3d at 561–562). "In deciding whether summary judgment is warranted, the court should consider 'numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Id.* (quoting *Price*, 283 F.3d at 720). The ultimate question is whether a reasonable fact-finder could conclude that the employer would not have fired the employee "but for"

the employee's decision to engage in an activity protected by Title VII. *See Alkhawaldeh*, 851 F.3d at 427 (quoting *Feist*, 730 F.3d at 454).

Wilkerson fails to demonstrate a conflict in substantial evidence with respect to whether Jefferson Parish's stated reasons for her termination were a pretext for retaliation. Wilkerson does emphasize a comment made by Juncker in his deposition: "[W]hy would I want to keep somebody in a position where she felt like people were retaliating against her …"[132] However, Wilkerson's presentation of this testimony truncates the end of Juncker's statement, which clarifies: "where there was no proof that anybody was retaliating against her other than two missing teabags [that Wilkerson suspected someone stole from her office]?"[133] Juncker proceeds to explain that the important criteria for his decision included the fact that Wilkerson lacked "basic supervision skills" and that "[d]irect supervision, personal contact, is important."[134] Read in context, this testimony does not suggest that Juncker would not have terminated Wilkerson "but for" her email complaining about Trosclair.

Further, as the Court discussed with respect to Wilkerson's discrimination claim, Wilkerson failed to present evidence contesting each of Jefferson Parish's stated reasons for her termination. Wilkerson simply has not demonstrated that Jefferson Parish's stated reasons were "false or unworthy of credence." *Harville*, 945 F.3d at 879.

---

[132] R. Doc. No. 62, at 24 (citing R. Doc. No. 60-3, at 72).
[133] R. Doc. No. 60-3, at 72–73.
[134] *Id*. at 73.

Lastly, Wilkerson's February 17, 2020 email came only after Trosclair conducted his surprise inspection in January 2020 and provided Wilkerson with a "below expectations" performance review.  The Court notes that Wilkerson sent her February 17, 2020 email to Juncker only after her pre-disciplinary hearing where Juncker discussed her perceived shortcomings.  In light of this evidence, "no reasonable fact-finder could conclude that [Wilkerson] would not have been fired but for [her] decision to engage in activity protected by Title VII." *Alkhawaldeh*, 851 F.3d at 430.  "The 'but for' standard represents a 'high burden' that [Wilkerson] cannot meet and has not met." *Id.*  Because this claim fails at the pretext stage, summary judgment is warranted in favor of Jefferson Parish as to Wilkerson's Title VII retaliation claim.

### D.    Louisiana Employment Discrimination Law Claims

Both Title VII and the LEDL prohibit employers from discriminating based on "race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1); La. Rev. Stat. Ann. § 23:332.  As Title VII and the LEDL share the same scope, claims under the LEDL are analyzed under the Title VII framework and jurisprudence. *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007); *Harrell v. Orkin*, LLC, 876 F. Supp. 2d 695, 701 (E.D. La. 2012) (Africk, J.) ("[f]ederal courts look to Title VII jurisprudence to interpret the LEDL.").  For all the reasons explained above, Wilkerson's comparable LEDL claims fail.  Accordingly, Jefferson Parish is entitled to summary judgment on Wilkerson's LEDL claims for wrongful termination and retaliation.

### E.     Section 1981: Intentional Race Discrimination Claim

Wilkerson also claims a § 1981 intentional race discrimination claim, which she asserts under § 1983, against Jefferson Parish.  As this Court has previously explained in an earlier order, the "analysis of employment discrimination claims under Title VII and § 1981 is 'identical,' because 'the only substantive differences' between the two statutes are 'their respective statutes of limitations and the requirement under Title VII that the employee exhaust administrative remedies.'"  *Chen v. Oschner Clinic Found.*, 630 F. App'x 218, 227 (5th Cir. 2015); *see also Patrick v. Walmart, Inc.*, 859 F. App'x 687 n.2 ("Race discrimination claims under Title VII and under section 1981 are 'parallel' and require the 'same proof to establish liability.'").  Because the analysis is the same, the Court analyzes this claim under the Title VII framework.  *See Woods v. Cantrell*, No. 20-482, 2021 WL 981612, at *13 (E.D. La. Mar. 16, 2021) (Africk, J.).  For all the reasons explained above, Wilkerson's comparable § 1981 claim fails.  Accordingly, Jefferson Parish is entitled to summary judgment on Wilkerson's § 1981 claim for wrongful termination due to intentional race discrimination.

### IV.     CONCLUSION

As discussed above, all of Wilkerson's remaining claims fail as a matter of law. Therefore,

**IT IS ORDERED** that Jefferson Parish's motion[135] for summary judgment is **GRANTED** and that Wilkerson's claims against Jefferson Parish are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Jefferson Parish's motion[136] *in limine* is **DISMISSED AS MOOT**.

New Orleans, Louisiana, October 27, 2021.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[135] R. Doc. No. 60.
[136] R. Doc. No. 69.